IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

United States of America,           )
                                    )
          Plaintiff,                )
                                    )
     v.                             )          Civil Action No. 1:11cv107 (LO/TRJ)
                                    )
$12,455 U.S. Currency,              )
                                    )
          Defendant.                )
_____)

## REPORT AND RECOMMENDATION

This matter is before the court on plaintiff's motion for default judgment and forfeiture

(no. 9). The subject property was seized in Alexandria, Virginia on July 14, 2010 pursuant to the

execution of a criminal search warrant issued by this court. Plaintiff filed a verified complaint *in*

*rem* for civil forfeiture pursuant to 21 U.S.C. § 881(a)(6) on January 31, 2011 (no. 1). The Clerk

issued a warrant for arrest *in rem* on January 31, 2011 (no. 3) pursuant to Rule G(3)(b)(i) of the

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and the

warrant was returned executed on February 18, 2011 (no. 5) pursuant to Fed. R. Civ. P. Supp. R.

G(3)(c). In accordance with Fed. R. Civ. P. Supp. R. G(4)(b)(i), plaintiff sent written notices of

civil forfeiture as well as copies of the verified complaint to the residences of Dr. Larren Wade,

Garland Lloyd Hancock, Sr., and Sonny Hancock, each of whom reasonably appeared to be

potential claimants of the subject property, via certified mail.[1] Plaintiff also published notice of

---

[1] In the case of Dr. Wade, plaintiff sent a written notice and a copy of the verified complaint to both his residence and care of an attorney, Karen Scarborough, Esq.

this civil forfeiture action on www.assetforfeiture.gov for 30 consecutive days beginning on February 1, 2011 in accordance with Fed. R. Civ. P. Supp. R. G(4)(a)(iv)(C) (no. 6). No person or entity has filed a claim or an answer to the complaint. The Clerk entered default on April 29, 2011 (no. 8). Upon consideration of plaintiff's motion and the memorandum in support thereof, the magistrate judge makes findings as follows and recommends that default judgment be entered.

## Jurisdiction and Venue

This court has jurisdiction pursuant to 28 U.S.C. § 1345 because this action was commenced by the United States and 28 U.S.C. § 1355 because this is an action for forfeiture. There is *in rem* jurisdiction because the court has control of the subject property pursuant to service of the arrest warrant discussed *supra*. Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts giving rise to forfeiture occurred in this district.

## Appropriateness of Default Judgment

Federal Rule of Civil Procedure 55 permits the court to grant a motion for default judgment where the well-pled allegations of the complaint establish plaintiff's entitlement to relief, and where a defendant has failed to plead or defend as provided by and within the time frames contained in the rules. *Music City Music v. Alfa Foods, Ltd.,* 616 F. Supp. 1001, 1002 (E.D. Va. 1985); Fed. R. Civ. P. 55. In the civil forfeiture context, default judgment is permitted where no potential claimant has filed a response to the complaint. *See United States v. $3,500.00 in U.S. Currency*, No. 5:07-CV-312-F, 2008 WL 215807, at *1 (E.D.N.C. Jan. 24, 2008) (Order); *United States v. 47 W. Oakview Rd.*, No. 1:10-CV-88, 2011 WL 304972, at *1 (W.D.N.C. Jan. 28, 2011); *United States v. $36,110.00 in U.S. Currency*, No. 4:08-CV-0029, 2010 WL 6065117, at *2 (D.S.C. Dec. 17, 2010) (Report and Recommendation). As discussed *supra*, no potential

claimant has filed a response to the complaint, and entry of default judgment is therefore permitted.

## Factual Background

The Drug Enforcement Agency seized the defendant currency at the medical office of Dr. Larren Wade in Alexandria, Virginia on July 14, 2010. Compl. ¶ 2. The DEA, together with the Federal Bureau of Investigation and the Alexandria Police Department, began investigating Dr. Wade in June 2010 after receiving concerns from pharmacists about customers presenting prescriptions from Dr. Wade for large amounts of high-doses of OxyContin and Roxicodone, which are brand name formulations for Oxycodone, a Schedule II controlled substance. Compl. ¶¶ 7-8. In checking patient prescription records, the pharmacists learned that these were oftentimes the patients' first prescriptions for those drugs, and were concerned that starting a patient on such a high dosage could lead to the patient's death. Compl. ¶ 8.

A check of the Virginia Prescription Monitoring Program revealed that the number of prescriptions for Schedule II, III, and IV drugs filled in Virginia under Dr. Wade's DEA registration number was relatively constant from June 10, 2006 to January 2010, but rose considerably beginning in February 2010 and continued to rise through May 2010. Compl. ¶ 10. Undercover agents conducting surveillance at Dr. Wade's office observed large numbers of patients, including known prescription drug abusers, addicts, and distributors, waiting at Dr. Wade's office as early as 6:30 a.m. Compl. ¶¶ 11-12. Some of those patients told agents that Dr. Wade was a source for prescription drugs sold on the street. Compl. ¶ 12.

A pair of undercover agents, posing as husband and wife, walked into Dr. Wade's office on June 11, 2010 to attempt to see Dr. Wade, but were told they needed an appointment and were escorted from the building by an office manager. Compl. ¶¶ 14-15. After the agents were told by

the boyfriend of a waiting patient in the parking lot that they could circumvent the office manager by calling Dr. Wade directly, they called Dr. Wade on his personal cell phone. Compl. ¶ 15. The "husband" explained that his "wife" was sick, and Dr. Wade instructed them to tell the office manager they were to be seen without an appointment. Compl. ¶ 15.

Inside the office, the "wife" was asked to pay an initial office fee of $125.00 in cash. Compl. ¶ 16. Information gathered by the agents indicated that Dr. Wade operated entirely or almost entirely in cash. Compl. ¶ 13. For instance, on each visit to Dr. Wade's office, the agents were charged in cash, and they observed no charge card machine or logo in the office. Compl. ¶ 13. The agent was also asked to fill out a medical history form, on which she indicated only that she had knee and ankle pain. Compl. ¶ 16. She told Dr. Wade that she had hurt her knee and ankle stepping off a curb three years ago and that she was feeling sick as a result of not having had any medication for two days. Compl. ¶ 16. After a cursory examination, Dr. Wade wrote the agent prescriptions for a large amount of Oxycodone and an anti-inflammatory drug. Compl. ¶ 16. Dr. Wade did not establish a treatment plan, check the agent's vital signs, or perform tests to ensure that Oxycodone was not contraindicated. Compl. ¶ 17.

On June 15, 2010, the "husband" returned to Dr. Wade's office without an appointment. Compl. ¶ 18. He paid the $85.00 office visit fee in cash and told Dr. Wade he wanted the same drugs Dr. Wade had prescribed his "wife" four days prior. Compl. ¶ 18. Dr. Wade asked what he had prescribed, and the agent stated that he wanted OxyContin (80 mg) pills and Methadone. Compl. ¶ 18. Dr. Wade wrote a prescription for 90 OxyContin (80 mg) pills and 180 Roxicodone (30 mg) pills. Compl. ¶ 18. Again, Dr. Wade did not establish a treatment plan, check the agent's vital signs, or perform tests to ensure that Oxycodone was not contraindicated, nor did he determine the medical need for the prescription. Compl. ¶ 19.

The same agents each returned to Dr. Wade's office on June 21 and July 1, 2010, and each time paid the $85.00 office visit fee in cash and received prescriptions for a 30-day supply of OxyContin without an examination or the provision of medical records from any previous treatment. Compl. ¶ 20.

On June 21, another undercover female agent went to Dr. Wade's office without an appointment, paid the $125.00 initial office fee visit in cash, and complained to Dr. Wade about a nonexistent shoulder injury. Compl. ¶ 21. After a cursory examination, Dr. Wade stated that there was something wrong with the agent's shoulder and prescribed 120 Roxicodone (30 mg) pills and 60 anti-inflammatory drug pills. Compl. ¶ 21. As with the previous two agents, Dr. Wade did not establish a treatment plan, check the agent's vital signs, or perform tests to ensure that Oxycodone was not contraindicated. Compl. ¶ 21.

The "husband" and "wife" team returned to Dr. Wade's office on July 7, 2010 to obtain additional prescriptions, but were informed by the office manager that Dr. Wade was out of town. Compl. ¶ 22. The office manager instructed the agents to write their names, contact numbers, and drugs they were regularly prescribed on a list so that Dr. Wade could write the prescription on his return. Compl. ¶ 22. The "wife" wrote the names of drugs she had previously been prescribed, but doubled the amount. Compl. ¶ 22. The agents each paid the $85.00 office visit fee in cash, and the "husband" gave the office manager $40.00 as an "off the book" payment. Compl. ¶ 22.

Later that day, the "husband" called the office manager to request prescriptions for his "wife's sister" and was told to return to the office and pay the $85.00 office visit fee in cash. Compl. ¶ 23. The "husband" and "wife" did so, leaving a fictitious name for the "wife's sister" and a list of desired prescriptions, as well as giving the office manager an additional $40.00 in

cash for allowing them to leave the "sister's" name on the list.  Compl. ¶ 23.

On July 8, 2010, the agents returned to Dr. Wade's office to pick up their prescriptions.
Compl. ¶ 24.  The "husband" received prescriptions for 90 OxyContin (80 mg) pills and 240
Oxycodone (30 mg) pills.  Compl. ¶ 24.  The "wife" received prescriptions for 240 Oxycodone
(30 mg) pills and 120 OxyContin (80 mg) pills.  Compl. ¶ 24.  The "wife's sister" received
prescriptions for 60 OxyContin (80 mg) pills and 120 Oxycodone (30 mg) pills.  Compl. ¶ 24.

On July 14, 2010, a federal search warrant was executed on Dr. Wade's office, and agents
seized the defendant currency from various locations in the office.  Compl. ¶ 25.

## Standard

A defendant in default, and a claimant who fails to assert a claim *in rem*, is deemed to
have admitted all of the plaintiff's well-pled allegations of fact, which then form the basis for
judgment in the plaintiff's favor.  *See Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780
(4th Cir. 2001) (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th
Cir. 1975)).  When, as here, the action is *in rem* and the United States seeks forfeiture pursuant to
21 U.S.C. § 886(a)(6), the complaint must "state sufficiently detailed facts to support a
reasonable belief that the government will be able to meet its burden of proof at trial."  Fed. R.
Civ. P. Supp. R. G(2)(f); *United States v. $3,500.00 in U.S. Currency*, *supra*, at *1.  Thus, at
trial, plaintiff

> would have to prove, by a preponderance of evidence, that the property is subject to
> forfeiture.  *See* 18 U.S.C. § 983(c).  In other words, the Government would have to
> prove that it was more likely than not that the defendant property was used, or
> intended to be used, in exchange for controlled substances or represents proceeds of
> trafficking in controlled substances or was used or intended to be used to facilitate
> a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*

*Id.* at *2.  *See also United States v. $85,000.00 in U.S. Currency*, No. WDQ-10-0371, 2011 WL

1063295, at *2 (D. Md. Mar. 21, 2011) (quoting same). Plaintiff has provided an appropriate basis for judgment by providing sufficiently detailed facts to support a reasonable belief that it could prove, by a preponderance of evidence, that the defendant currency was involved in the illegal sale of prescriptions for Schedule II controlled substances.

## Discussion and Findings

The magistrate judge makes the following findings:

First, the magistrate judge finds that undercover agents paid $755.00 in cash to Dr. Wade's office in exchange for prescriptions for OxyContin, Roxicodone, Oxycodone, and anti-inflammatory medications. Second, the magistrate judge finds that Dr. Wade provided those prescriptions without undertaking any meaningful medical examination of the agents or observing any standard safeguards. Third, the magistrate judge finds that Dr. Wade's office operated on a cash basis, based on the agents' own experiences with Dr. Wade and the lack of any indication that charge cards were accepted as payment. Fourth, the magistrate judge finds that Dr. Wade provided prescriptions for the same and similar drugs to other patients in exchange for cash and without an appropriate medical basis. Fifth, the magistrate judge finds, based on the observed numbers of patients and Dr. Wade's cash-only policy, that the $12,455.00 in currency seized from Dr. Wade's office represents the proceeds of, is traceable to, and/or was used or intended to be used to facilitate sales of prescriptions of the same kind as those made to undercover agents. Sixth, the magistrate judge accordingly finds that the defendant currency seized from Dr. Wade's office constitutes money that is the appropriate subject of forfeiture under 21 U.S.C. § 881(a)(6).

## Recommendation

The magistrate recommends that default judgment be entered against the defendant

currency and that the defendant currency be forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6).

## **Notice**

By means of the court's electronic filing system, and by mailing a copy of this report and recommendation to the potential claimants named *supra*, the parties are notified as follows. Objections to this report and recommendation must be filed within fourteen (14) days of service on you of this report and recommendation. A failure to file timely objections to this report and recommendation waives appellate review of the substance of the report and recommendation and waives appellate review of a judgment based on this report and recommendation.

/s/
_____
Thomas Rawles Jones, Jr.
United States Magistrate Judge

June 29, 2011
Alexandria, Virginia